[Civ. No. 4223.   Third Appellate District.—December 10, 1930.]

M. LUCILE PLATT, Appellant, v. HARRY O. PLATT et al., Respondents.

H. C. Hopkins for Appellant.

Miller & Ellis for Respondents.

MR. PRESIDING JUSTICE FINCH Delivered the Opin-ion of the Court.—The plaintiff brought this action for the cancellation of a deed which she had executed to the

defendant Harry O. Platt, who will be referred to herein as the defendant and respondent, and also demanded judgment compelling him to reconvey the property described in the deed.

In his original answer the defendant alleged that in September, 1918, Martha E. Platt, the mother of the parties, conveyed the property in suit to the plaintiff with the understanding and agreement that if the defendant, who was then in the navy of the United States, ''died in the service . . . the plaintiff should have this property, but, that if this defendant lived, that the plaintiff would hold an undivided one-half interest in said property in trust for this answering defendant, and would convey the said interest to this answering defendant at such a time as he might desire to have his said share conveyed to him; . . . that thereafter and on or about November, 1919, the said Martha E. Platt died, and on or about December, 1919, the plaintiff placed the said deed of record; . . . that on or about March 27, 1925, this answering defendant was engaged in the business of brick contractor, and on or about such date he was offered certain contracts provided he could give a surety bond to guarantee the faithful performance of his contract; that in order to procure such surety bond it was necessary for this answering defendant to make a showing to the bonding company writing said bond that he was financially responsible; that . . . under such circumstances the plaintiff and this answering defendant agreed that she would deliver to him the deed referred to in . . . the plaintiff's complaint for the purpose of his putting the same of record; and it was further understood and agreed that such deed as to an undivided one-half interest was to convey to this answering defendant the undivided one-half interest in said property theretofore held in trust for him by the plaintiff; . . . that thereafter, in accordance with said agreement, he executed and placed of record a deed to the plaintiff reconveying to her an undivided one-half interest in the said property''.

The case has been tried twice. It appears from the appellant's opening brief that on the first trial judgment was entered in favor of the plaintiff quieting her title to the land in controversy. The defendant made a motion for a new trial, which was granted by the trial court. There-

after, the defendant filed an amended answer in which, in addition to the foregoing averments of the original answer, and as a separate defense, he alleged that the deed from Martha E. Platt to the plaintiff was never delivered.

The court found that Martha E. Platt signed a deed purporting to convey the property to the plaintiff; "that prior to the making of said deed it was understood and agreed between plaintiff and Martha E. Platt that if Martha E. Platt would make a deed to said property to plaintiff to convey title to plaintiff on the death of Martha E. Platt, that after the death of Martha E. Platt plaintiff would convey to defendant Harry O. Platt a one-half interest in said property upon his request, if he returned from the United States Navy and survived his mother Martha E. Platt"; but that said deed was never delivered by Martha E. Platt to the plaintiff. Judgment was entered "that plaintiff M. Lucile Platt and Harry O. Platt and their brother Howard R. Platt is each the owner of an undivided one-third interest in fee simple in the . . . property, . . . as tenants in common as heirs of their mother, Martha E. Platt, deceased, subject to administration upon the estate of said Martha E. Platt". The plaintiff has appealed from the judgment. The only question presented on this appeal is whether there is sufficient evidence to support the finding that the deed from Martha E. Platt to the plaintiff was never delivered.

In appellant's brief it is said: "We have never quoted one word of appellant's testimony or called the slightest attention to it. Our purpose is to forcefully demonstrate that we have made out a perfect case without a word from appellant's lips."

It may be conceded that the testimony other than that of the plaintiff makes out a good case in her behalf, but, unfortunately for her, at the first trial when no issue had been raised as to the delivery of the deed from the mother to the plaintiff, the latter gave testimony upon which the court, to a large extent, apparently based its findings at the second trial that the deed was not delivered.

In appellant's opening brief it is said: "The plaintiff was single and had been a school teacher for several years. During the year 1918, being the year the mother executed

to plaintiff the deed hereinafter referred to, the plaintiff was a clerk in the War Department in Washington, and the defendant was married and in the Navy; . . . the only property owned by the mother was that transferred to plaintiff by this deed. It was the home in Los Angeles where the family resided since about 1908, and a vacant tract at Culver City owned since about 1906. In September, 1918, the mother executed a grant deed to all of said property in favor of the plaintiff; . . . it recited a consideration of love and affection and $10. Four days after the mother's death, more than one year later, the deed was placed on record by the plaintiff.''

At the second trial, the plaintiff testified: ''I first saw that deed in the bank box that I held in the Security Trust and Savings Bank some time in May, I believe it was, after I came back from Washington, D. C.;'' that prior to her mother's death she took the deed and other papers out of the safe deposit box; that ''the deed, together with all the other papers were given to my mother,. and she, in turn, some few days after I had brought them home, . . . handed me the deed and told me that it was the deed to the property and that I had better take it up and have a certain friend of mine, who was there at the time, have it recorded for me. This particular friend worked down in the Hall of Records, and that is why my mother mentioned having her take it down and have it recorded for me, because I had given up the bank box; . . . she had handed me two or three other papers, too, in the meantime . . . and mother handed me the deed and she says, 'Lucile, now, there is a deed to the property. Let Marie take it down and have it recorded for you, so we won't have to worry about any bank to charge, as we haven't a bank box'; Q. Did you hand the deed to Marie at that time. A. No, I didn't. Q. What did you do with the deed? A. I held the deed and then after I had gone over the papers, went upstairs with the papers and put it away in the cedar chest with the other papers. Q. And did you give it to Marie to have it recorded? A. No, I didn't give it to Marie. Q. Where did you keep the deed during that time? A. In my cedar chest in my room, together with all the other papers. Q. How long was that? A. . . . . It must have been June. I

kept it there until, I believe it was, some time in December that I had it recorded. Q. Was that after your mother's death? A. After my mother died, yes''.

Marie testified that on the occasion referred to the mother handed the deed to the plaintiff and told her to have Marie place it on record. There is other testimony consisting largely of statements made by the mother tending to support the respective theories of the parties.

At the first trial the plaintiff testified: ''I left here in September . . . 1918 . . . it was the first part of the month, just before school started . . . my mother told me (at that time) that she intended to make out a grant deed of the place to me, for me to keep and to hold so that I would always have a home. . . . Q. Well, while you were away did you receive that deed? A. My mother told me (in a letter) that she had put the deed in the box . . . I did not keep the letter . . . it was shortly after September 20th; I do not remember just the date . . . she told me that she had a deed made out, made out in my name . . . and that she had put it in our box at the Security Trust and Savings Bank, so that it would be perfectly safe; that I was to have it recorded when I needed it, when she was no longer here . . . my mother wrote the letter, as near as I can remember it, shortly after the 20th of September, when she made the deed out . . . Q. Did you have a conversation with your mother on this subject-matter, that is, about the deed after you came back? A. I did . . . it occurred at home . . . my mother told me she had made the deed and she wanted me to go up to the bank and see that it was all right. Q. Anything else stated at the time on the subject. A. That was all. Q. Did you have any other conversation with your mother on that subject after that. A. No, sir. I saw the deed, I came back and I told her I had seen it, yes; . . . she said that she wanted to have things left for me, she was glad to have the home left for me; that was her idea, to leave a home for me. Q. Did you have any other conversation or conversations with your mother on that subject-matter prior to her death? A. No, sir, no, that was satisfactory. Q. What did you do with it, if anything? A. I left it in the box just as my mother wished me to do. Q. And what did you finally do

with it, if anything? A. After mother died I recorded it. . . . Q. Now, calling your attention to the time when your mother executed this deed, I believe you stated this morning that you and your mother had a safety deposit box at the Security Bank? A. We did. . . . Q. And you both had keys to that box, didn't you? A. We did. Q. And who put the deed in the box? A. My mother did. Q. Your mother put it in the box? A. She did. Q. Did you have a key to the box? A. Yes. Q. You had a key and your mother had a key. A. I had a key and my mother had a key. Q. And the box was a joint box which could be— A. Yes, it was. Q. Both parties had keys to it? A. Yes. Q. And it remained in that situation up to the time of your mother's death, did it? A. It did. Q. And after she died, did you find her key to the box? A. I do not remember what I did. I must have, though, because I changed the box afterwards. When I came back I took another box the next year when I came back. . . . Q. How long after your mother's death, did you go down and get the deed? A. I do not remember but it was sometime in December. Q. Of 1919? A. Yes. Q. When did your mother die? A. The 18th of December. The Court: Did you get it the same day that you recorded it, if you recall? A. I do not recall, I probably did.''

It was in the discretion of the trial court to believe that the plaintiff's testimony given at the first trial is true, notwithstanding there is corroboration of her contradictory testimony given at the second trial. It cannot be held as a matter of law that the plaintiff's testimony at the first trial is insufficient to support the finding that the deed was never delivered. According to that testimony, it remained until after her mother's death in the joint safe deposit box of the mother and the plaintiff. Such evidence does not necessarily show that the mother ever surrendered her right to retake possession of the instrument.

''While delivery may be by words and acts, or both combined, and manual transmission of the deed from the grantor to the grantee is not required, it is an indispensable feature of every delivery of a deed, whether absolute or conditional, that there be a parting with the possession of it, and with all power and control over it, by the grantor, for the benefit

of the grantee at the time of the delivery. The dominion over the instrument must pass from the grantor with the intent that it shall pass to the grantee, if the latter will accept it. And where the proof fails to show that the grantor did any act by which he parted with the possession of the deed for the benefit of the grantee, the question of intent becomes immaterial. In other words, delivery may be effected by any act or word manifesting an unequivocal intention to surrender the instrument so as to deprive the grantor of all authority over it or of the right of recalling it; but if it does not evidence an intention to part presently and unconditionally with the deed, there is no delivery. . . . While the rule that the grantor must part with all dominion and control over his deed does not mean that he must put it out of his physical power to procure repossession of it, nevertheless, if the deed remains within the grantor's control and is liable to be recalled, there is, according to almost unanimous authority, no delivery, notwithstanding that he has parted with its immediate possession. He must retain no right to reclaim or recall it.'' (8 R. C. L. 985. See, also, Devlin on Deeds, 3d ed., 375; *Stone* v. *Daily,* 181 Cal. 571 [185 Pac. 665]; *Donahue* v. *Sweeney,* 171 Cal. 388 [153 Pac. 708]; *Rice* v. *Carey,* 170 Cal. 748 [151 Pac. 135]; *Kenniff* v. *Caulfield,* 140 Cal. 34 [73 Pac. 803]; *Reed* v. *Smith,* 125 Cal. 491 [58 Pac. 139]; *Black* v. *Sharkey,* 104 Cal. 279 [37 Pac. 939]; *Cotter* v. *Cotter,* 92 Cal. App. 722 [268 Pac. 696]; *Elliott* v. *Merchants' Bank & Trust Co.,* 21 Cal. App. 536 [132 Pac. 280].)

The judgment is affirmed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 9, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 5, 1931.